**Michael PERRY, Plaintiff,**

v.

**CITY OF CHICAGO, William R. Quinlan, James R. Rochford, Lt. Casey, John O'Malley, Officer L. Schultz, Officer Walter Moll, Officer David Marlowe, Officer James Dillon, and other unknown agents of the Chicago Police Department, Defendants.**

**No. 77–2011.**

United States District Court, N. D. Illinois, E. D.

Oct. 18, 1979.

**500**

Lance Haddix, Chicago, Ill., for plaintiff.

Frank J. Dolan, Asst. Corp. Counsel, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

*Motion For Partial Summary Judgment*

MAROVITZ, District Judge.

This action was commenced by Michael Perry on June 6, 1977 pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201–02 to obtain declaratory, injunctive, and monetary relief. Plaintiff, a blind citizen, holds a Class II peddlers license from the City of Chicago (City), and challenges the constitutionality of certain City ordinances which prohibit him from peddling any merchandise in the downtown area of the City. The challenged ordinances are set forth in an appendix to this opinion. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343.

Plaintiff's first amended complaint, filed July 20, 1978, asserts four causes of action. Count I of plaintiff's complaint alleges that sections 36–49 and 160–13 of the Chicago Municipal Code (Code) and section 974 of the Revised Chicago Code of 1931, which sections prohibit plaintiff from peddling in the downtown area, operate so as to deprive him of his peddler's license without due process of law. Plaintiff alleges that such ordinances bear no reasonable relationship to the City's asserted purpose to relieve downtown congestion.

Count II of plaintiff's complaint mounts a similar attack upon the ordinances complained of in Count I. Sections 36–11 through –18, 36–49.1, and 160–13.2 of the Code and section 974 of the Revised Chicago Code of 1931 permit peddling during the Christmas season and solicitation on designated days by charitable organizations. Plaintiff alleges that these exceptions render the general prohibition against peddling in the downtown area discriminatory and violative of due process.

Count III of plaintiff's complaint challenges section 193–1(f) of the Code, a provision of the City's disorderly conduct ordinance, alleging it to be vague and overbroad on its face. Count IV of plaintiff's complaint asserts that defendant Dillon, pursuant to an arrest for a violation of section 193–1(f) conducted such arrest falsely, maliciously, and without probable cause. Further, plaintiff's brief in opposition to defendants' motion for partial summary judgment endeavors to insert a First Amendment claim into this action, alleging that the City's ban on peddling in the downtown area operates as a prior restraint upon commercial speech. Plaintiff requests relief in the form of a declaratory judgment declaring the complained of ordinances to be violative of his Fourteenth Amendment rights, preliminary and permanent injunctive relief prohibiting defendants from prosecuting plaintiff pursuant to the challenged ordinances, and monetary damages in the amount of $100,000.

Pending before this Court is defendants' motion for partial summary judgment.

Fed.R.Civ.P. 56(c). Defendants' motion asserts that they are entitled to judgment as a matter of law with respect to Counts I–III of plaintiff's complaint. The Court finds that there are no genuine issues of material fact present concerning Counts I–III of plaintiff's complaint and, accordingly, these portions of plaintiff's complaint are ripe for summary judgment. Fed.R.Civ.P. 56. For the reasons set forth below, defendants' motion is granted.

Section 36–49.1 of the Code prohibits the peddling of all articles except newspapers within certain districts to be designated by the City Council. Chicago, Ill.Mun.Ordinances ch. 36, § 49.1. Section 49.1 further provides that the Mayor may authorize the Superintendent of Compensation to issue permits to peddle toys and novelties during the period from December 15 to December 25 of each year. *Id.* Section 160–13 of the Code is similar to the above ordinance but is specifically directed at holders of peddler's licenses. Chicago, Ill.Mun.Ordinances ch. 160, § 13. Section 974 of the Revised Code of 1931 designates as a designated district within the meaning of sections 36–49 and 160–13 the area bounded on the north by the Chicago River, on the east by Lake Michigan, on the south by the south line of Roosevelt Road, and on the west by the Chicago River (the "downtown area"). Chicago, Ill.Rev.Code of 1931, § 974. The effect of these ordinances upon plaintiff is that although he holds a valid Class II peddler's license, he may not peddle in the downtown area.

Plaintiff seeks to invoke upon his behalf the substantive and procedural protections of the due process clause of the Fourteenth Amendment by arguing that the City's issuance of a peddler's license to plaintiff created an entitlement running to plaintiff's benefit which constitutes a property or liberty interest within the meaning of the Fourteenth Amendment. Plaintiff contends that an examination of the City's peddler ordinance leads to a finding that the City has granted the holders of such licenses a vested, "tenured right to such employment itself." Plaintiff's Brief, p. 6. Therefore, plaintiff argues, having shown the existence of a statutory entitlement, plaintiff is to be accorded the substantive protections conferred by the Fourteenth Amendment; *i. e.,* to be free from unreasonable and arbitrary government interferences with respect to the enjoyment of such entitlement, *Lawton v. Steele,* 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385 (1894), and to require that any governmental interferences be accompanied by certain procedural guarantees. *See, e. g., Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

■ In order for this Court to invoke the protections of the Fourteenth Amendment's due process clause, the plaintiff must first establish the existence of a liberty or property interest. *Barry v. Barchi,* —— U.S. ——, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979). Plaintiff's brief correctly characterizes "liberty" and "property" as merely the conceptual core of those interests protected by the due process clause. *E. g., Board of Regents v. Roth,* 408 U.S. 564, 572, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Indeed, the terms "liberty" and "property" have been interpreted to embrace a broad range of interests. *E. g., Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (public education); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (state prisoner's good time credits); *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (revocation of parole); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (welfare benefits). In short, Fourteenth Amendment protected interests are rarely constitutionally created, rather they are more often created by way of a state statute or rule. *Goss v. Lopez,* 419 U.S. 565, 572–73, 95 S.Ct. 729, 42 L.Ed.2d 725. However, in the instant action plaintiff has failed to establish a cognizable due process interest with respect to his asserted right to peddle in the downtown area. Because plaintiff has failed to overcome this threshold hurdle, his due process claim must fail. *Barry v. Barchi,* —— U.S. at ——, 99 S.Ct. 2642.

■ The challenged ordinances do not impinge upon a liberty interest of plain-

tiff's. The ordinances neither prohibit plaintiff from engaging in his chosen occupation, *see Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), nor do they impermissibly jeopardize his integrity or otherwise stigmatize him. *Board of Regents v. Roth*, 418 U.S. at 573, 92 S.Ct. 2701. The plaintiff herein has no more shown the existence of an affected liberty interest than the plaintiff in *Roth* who, as a nontenured teacher, was denied continued employment. There the Court stated that "[i]t stretches the concept of liberty too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains free as before to seek another." *Id.* at 575, 92 S.Ct. at 2708.

■ The Supreme Court has defined a protected property interest as a state-fostered justifiable expectation, as opposed to a mere "unilateral expectation," created and defined by state law, *Board of Regents v. Roth*, 408 U.S. at 577, 92 S.Ct. 2701; or arising from "mutually explicit understandings." *Perry v. Sinderman*, 408 U.S. 593, 691, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). As defendants point out, the challenged ordinance, as a matter of public record, operated to restrict the applicability of plaintiff's peddler's license to those areas outside the downtown area long before plaintiff was granted his license. Thus, it is clear that when plaintiff's peddler's license is read in conjunction with the then extant ordinances regulating peddling it can not be said that the former conferred upon plaintiff a property interest in the form of a right to peddle in the downtown area.

■ Moreover, plaintiff has not shown the existence of any "mutually explicit understanding" between himself and the City to the effect that plaintiff was to be able to exercise his peddler's license in the downtown area. The challenged city ordinances, in effect at the time plaintiff received his peddler's license, militate against such a finding. In short, plaintiff's alleged property interest can only be deemed a unilateral expectation, as opposed to a state-fostered, justifiable expectation.

■ As stated, because plaintiff has failed to make the requisite showing of an affected liberty or property interest, he is not entitled to the substantive and procedural protections afforded by the due process clause. *See Barry v. Barchi*, —— U.S. ——, 99 S.Ct. 2642. Notwithstanding, the Court notes that the challenged ordinances would withstand the substantive due process claim asserted in Count I of plaintiff's complaint in that the City's avowed purpose to relieve congestion in the downtown area is a proper purpose and the ordinances are reasonably related to achieving that purpose. *City of Chicago v. Rhine*, 363 Ill. 619, 2 N.E.2d 905 (1936).

■ Count II of plaintiff's complaint seeks to invalidate the ordinances which create a general prohibition against peddling in the downtown area on the grounds that the exceptions to the general prohibition provided for in sections 36–11 through 18, 36–49.1, and 160–13.2 of the Code and section 974 of the Revised Chicago Code of 1931 allegedly result in a discriminatory application of the general prohibition violative of plaintiff's Fourteenth Amendment rights. Because plaintiff does not allege that the exceptions to the challenged ordinances create a classification system based upon a suspect class or affecting a fundamental interest, the standard of rationality, rather than strict scrutiny, is to be used in determining whether the ordinances work a violation of plaintiff's right to equal protection. *E. g., Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). Thus, the Court begins with the proposition that the challenged ordinances will not be overturned "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the Court] can only conclude that the legislature's actions were irrational." *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979). Plaintiff, as the party challenging the legislative judgment, bears the burden of demonstrating that the legislative facts upon which the classification is apparently based could not have reasonably been conceived to

be true by the legislative decisionmaker. *Barry v. Barchi,* —— U.S. at ——, 99 S.Ct. 2642; *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78–97, 31 S.Ct. 337, 55 L.Ed. 369 (1911). That the facts upon which the legislative judgment is based are subject to reasonable dispute will not suffice to invalidate the ordinance. *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1969); *Rast v. Van Deman & Lewis Co.,* 240 U.S. 342, 357, 36 S.Ct. 370, 60 L.Ed. 679 (1916).

Section 36–49.1 of the Code and section 974 of the Revised Chicago Code of 1931 provide an exception to the general prohibition against peddling in the downtown area by allowing the Mayor "to authorize the superintendent of compensation to issue temporary permits to street vendors authorizing them to sell toys and novelties within [the downtown area] between the 15th day of December and the 25th day of December of each year." Although this exception would seem to be particularly contrary to the City's goal of relieving downtown congestion, it apparently reflects the judgment that the availability of particular goods—toys and novelties—to be sold by peddlers during a well-defined portion of the Christmas season is a sufficiently countervailing goal. Similarly, the narrow and well-defined exceptions set forth in sections 36–11 through –18 and 36–49.1 of the Code permitting qualifying charitable organizations to solicit in the downtown areas for one day each year apparently reflects the legislative judgment that any resulting contribution to downtown congestion for a few days a year is outweighed by the benefit achieved by providing charitable organizations with a one day a year opportunity to raise funds for the promotion of their particular eleemosynary causes.

■ It cannot be contended that amelioration of downtown congestion, permitting the peddling of toys during the Christmas season, or permitting charitable organizations to solicit contributions one day a year are improper legislative purposes. Moreover, plaintiff's arguments do not convince this Court that the classification scheme created by the challenged ordinances is so unrelated to the achievement of these several purposes that the legislature's actions were irrational. *Vance v. Bradley,* 440 U.S. 93, 99 S.Ct. 939. Further, plaintiff does not allege in Counts I–III of his complaint that he is treated any differently under the classification scheme created by the challenged ordinances than any other holder of a Class II peddler's license. Accordingly, the Court concludes that the peddling ordinances do not abridge plaintiff's constitutional rights as secured by the equal protection clause of the Fourteenth Amendment.

■ Turning to plaintiff's constitutional attack upon the City's disorderly conduct ordinance, the Court finds plaintiff's arguments here to be without merit. Section 193–1(f) defines as disorderly conduct "begging or soliciting funds on the public ways, except as provided in Chapter 36, Sections 11 through 18." Therefore, a bare reading of this provision would seem to pose a conflict *vis a vis* the exercise of valid peddler's licenses outside the downtown area. However, this provision has not been alleged to have been enforced against plaintiff outside the downtown area and plaintiff does not complain of section 193–1(f) on such grounds. Plaintiff apparently acknowledges that it is the City's policy to enforce section 193–1(f) only with respect to peddling in the downtown area. Plaintiff's Complaint, p. 5. The substance of plaintiff's challenge to section 193–1(f) is that it is impermissibly vague and overbroad in that it applies equally to vagrants as well as peddlers. *Id.,* p. 5–6. The Court is unconvinced by plaintiff's arguments that section 193–1(f) is unconstitutionally vague. In view of the City's acknowledged policy of limiting enforcement of section 193–1(f) to the downtown area, the section is not so vague, indefinite and uncertain that one cannot determine its meaning." *Lanzetta v. New Jersey,* 306 U.S. 451, 458, 59 S.Ct. 618, 83 L.Ed. 888 (1938). Rather, section 193–1(f) clearly proscribes soliciting by plaintiff in the downtown area, when read in conjunction with the City's limited construction of that ordinance. Nor is section

193–1(f) overbroad. Since this Court rejected plaintiff's claim that he has a constitutionally protected right to peddle in the downtown area, plaintiff can not be heard to complain that section 193–1(f) embraces within its ambit constitutionally protected activity. *See Thornhill v. Alabama,* 310 U.S. 88, 97, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

■■■■ Finally, the Court rejects plaintiff's contention that the City's prohibition against peddling in the downtown area affects his First Amendment rights. The First Amendment protects communications and, quite simply, plaintiff has not identified what it is he desires to communicate or how the City's peddling restrictions impinge his ability to communicate. Although it is now recognized that commercial speech does fall within First Amendment protection, the commercial speech cases all concern prohibitions upon communications designed to either promote the sales of the commercial speaker or better inform the listening public. *E. g., Linmark Associates, Inc. v. Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 50 L.Ed.2d 155 (1976) (realtor for sale signs); *Virginia Pharmacy Board v. Virginia Citizens Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed. 346 (1976) (pharmacists' advertising of prescription prices); *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975) (newspaper advertisement of abortion referral agency). If plaintiff's argument is that the City's prohibition of peddling in the downtown area restricts him from informing the public about his wares, the Court finds the prohibition to be a valid "time, place, and manner" regulation in that the prohibition is concerned only with the place of the communication and not the content thereof. *Linmark Associates, Inc. v. Willingboro,* 431 U.S. at 92–93, 97 S.Ct. 1614. Therefore, as the Court reads plaintiff's First Amendment claim, the commercial speech cases afford no protection to plaintiff in the instant case.

In conclusion, the Court hereby grants judgment in defendants favor on Counts I, II, and III of plaintiff's complaint, and, therefore, only Count IV of plaintiff's complaint remains pending. Accordingly, defendants' motion for partial summary judgment is hereby granted.

## APPENDIX

USE OF PUBLIC WAYS AND PLACES   §§ 36–8 to 36–14

### Play Streets

**36–8.** [Repealed. Coun.J. 12–22–50, p. 7606.]   Play streets authorized

**36–9.** [Repealed. Coun.J. 12–22–50, p. 7606.]   Barricades and signs

**36–10.** [Repealed. Coun.J. 12–22–50, p. 7606.]   Supervision

### Tag Days

**36–11.** The term "tag days" is hereby defined to mean those days on which it shall be lawful for charitable organizations to solicit funds for charitable purposes upon the public ways of the city through the means of distributing emblems, or selling flowers or other merchandise, the possession of such emblem or flower indicating those who have contributed to such fund or funds.   Definitions

"Poppy Day," for the purpose of this chapter, shall be held to be a day on which it shall be lawful for the Grand Army of the Republic, the United Spanish War Veterans, the Veterans of Foreign Wars, and The American Legion, to solicit funds for the purpose of relief of soldiers, sailors and marines, formerly or currently in the service of the

government of the United States, and their distressed families, by means of selling "poppies" upon the public ways of the city.

"Doughnut Day," for the purpose of this chapter, shall be held to be a day on which it shall be lawful for the Salvation Army to solicit funds for the general purposes of its organization in the city of Chicago by means of selling doughnuts, or facsimiles thereof, upon the public ways of the city. [Amend. Coun.J. 5–13–42, p. 6982; 10–27–43, p. 753.]

**36–12.** Supervision and control over all tag days shall be vested in a standing committee of the city council. Said standing committee may prescribe such rules and regulations as it may deem necessary for the purpose of carrying out the provisions of this chapter and properly controlling the conduct of any one of the tag days provided for hereunder. *Supervision*

**36–13.** Tag days are hereby limited to three annually, and they shall be held on such days as may be designated by the city council. One of said tag days may be held in the spring of each year, under the direction and management of the Children's Benefit League of Chicago and Suburbs; one may be conducted in the spring under the direction and management of the Chicago Federation of Aged and Adult Charities; and the remaining tag day shall be held and conducted on such day as the city council may designate, and such charitable organizations may participate therein as may be approved by the mayor, provided that each such organization shall conform to the standards set forth in this chapter. *Limitations*

The soliciting or collection of funds for charitable purposes, upon the public ways of the city, except upon the tag days designated by this chapter, and except upon the Poppy Days and Doughnut Days hereinafter designated and authorized in sections 36–11 and 36–16 to 36–18, is hereby prohibited. [Amend. Coun.J. 10–27–43, p. 753; 3–1–62, p. 6799; 11–15–65, p. 5365.]

**36–14.** No charitable organization shall conduct or share in the proceeds of any such tag day, whether affiliated with or a part of either the Children's Benefit League of Chicago and Suburbs, the Chicago Federation of Aged and Adult Charities, or otherwise, unless it conforms to the following requirements: *Requirements for participation*

(a) Shall be, and shall have been for not less than one year prior to application hereunder, a corporation organized under the laws of the state of Illinois and shall have been actually engaged during such period in charitable and philanthropic work for which it was chartered, churches excepted.

(b) Shall have a responsible, local administrative body, meeting not less than four times in each year, and shall be performing a charitable function or engaged in charitable work, which, in the opinion of said standing committee of the city council, shall be commensurate with the funds received and distributed by it.

(c) Shall agree to co-operate and shall co-operate with all other charitable organizations in promoting efficiency of administration in charitable work, with a view to preventing duplication of effort and a waste of funds collected therefor.

(d) Shall submit to said standing committee, in connection with its application, a statement showing its receipts and disbursements

for one year previous to making application, sworn to by a responsible officer thereof before a regularly qualified notary public.

(e) Shall not, in connection with said tag day, employ paid solicitors.
[Amend. Coun.J. 3–1–62, p. 6799.]

**36–15.** Before engaging in or conducting any tag day, each organization shall make application for permission therefor to said standing committee in such form as it may designate, not less than thirty days prior to such tag day; provided, however, that said standing committee may accept, subject to the approval of the mayor, one application from each said Children's Benefit League of Chicago and Suburbs and said Chicago Federation of Aged and Adult Charities if each such application shall specify each separate charitable organization affiliated with said organization and proposing to share in the proceeds of the tag day held by the organization to which affiliated. No organization shall be granted permission to hold, or participate in, more than one tag day in any one year. [Amend. Coun.J. 3–1–62, p. 6799.] <span style="float:right">Application</span>

**36–16.** Poppy Day is hereby limited to one day in May of each year, as near Memorial Day as practicable, and to be designated from year to year by the said standing committee of the city council. <span style="float:right">Poppy Day</span>

Doughnut Day is hereby limited to one day in each year, to be designated from year to year by the standing committee of the city council, subsequent to Poppy Day. [Amend. Coun.J. 10–27–43, p. 753.]

**36–17.** Each organization granted permission to conduct any tag day, Doughnut Day, or to participate in the Poppy Day solicitation, under the provisions of this chapter, shall within sixty days from and after the date of holding said tag day, Doughnut Day or Poppy Day, file with said standing committee of the city council a statement showing all receipts and disbursements of money derived from said tag day, Doughnut Day or Poppy Day sworn to as to accuracy before a duly authorized notary public. <span style="float:right">Filing of statements</span>

Said standing committee may, in its discretion, accept from said Children's Benefit League of Chicago and Suburbs and said Chicago Federation of Aged and Adult Charities, or either of them, a consolidated, sworn statement of a responsible officer of each such organization, showing the receipts and disbursements of all affiliated organizations sharing in any tag day conducted by either of such organizations; but nothing herein contained shall limit the power of said standing committee to demand and receive a separate sworn report from any such affiliated organization. [Amend. Coun.J. 10–27–43, p. 753; 3–1–62, p. 6799.]

**36–18.** Said standing committee shall, on or before March 1 in each year, file with the city council a report as to all tag days, Doughnut Day and Poppy Day conducted during the preceding year, giving the name of each organization granted a permit hereunder, or its address and the nature of the charity conducted by it, together with a copy of the report of each such organization and of each organization participating in Poppy Day, and also of the receipts and disbursements of money derived from each tag day, Doughnut Day or Poppy Day conducted by it. [Amend. Coun.J. 10–27–43, p. 753.] <span style="float:right">Annual report</span>

MUNICIPAL CODE OF CHICAGO

### Requirements and Restrictions

**36–19.** Every owner, lessee, tenant, occupant or other person having charge of any building or lot of ground in the city abutting upon any public way or public place shall remove the snow and ice from the sidewalk in front of such building or lot of ground.

*Snow and ice removal*

If the sidewalk is of greater width than five feet, it shall not be necessary for such person to remove snow and ice from the same for a space wider than five feet.

In case the snow and ice on the sidewalk shall be frozen so hard that it cannot be removed without injury to the pavement, the person having charge of

**36–49.** It shall be unlawful for any person including the owner of any business adjacent to or near the public way, either in person or through any agent or employe to stand upon, use or occupy the public ways to solicit the trade, custom or patronage for such business, or to interfere with or impede any pedestrian or any one in a vehicle on a public way, for purpose of soliciting business.

*Soliciting business*

Any such soliciting of business on any public way is hereby declared to be a nuisance and the owner or proprietor of any such business who shall refuse or neglect to abate such nuisance after being notified in writing so to do by the superintendent of police, shall be fined not less than ten dollars nor more than two hundred dollars for each and every day he shall refuse or neglect to abate such nuisance.

Provided, nothing in this section shall be construed to include any business operated wholly or entirely upon any public way under or by virtue of a lawful permit or license issued therefor.

**36–49.1.** No person shall sell, offer or expose for sale, or solicit any person to purchase any article whatsoever, except newspapers, on any public way or other public place within the districts heretofore or hereafter designated by the city council;* provided, that the mayor may in his discretion authorize the superintendent of compensation to issue temporary permits to street vendors authorizing them to sell toys and novelties within the said districts between the 15th day of December and the 25th day of December of each year. (Amend. Coun.J. 12–21–39, p. 1396; 4–25–69, p. 5364.)

*Sales within designated areas restricted*

**160–1.** The word "peddler" is hereby defined to mean any individual who, going from place to place shall sell, offer for sale, sell and deliver, barter, or exchange any goods, wares, merchandise, wood, oil, fish, fruits, vegetables, or country produce from a vehicle or otherwise.

*Definition*

**160–2.** For the purpose of this chapter peddlers are divided into three classes as follows:

*Classification*

Class I. *Wagon or cart peddlers.* This class shall include peddlers selling from wagons, pushcarts, handcarts, or other vehicles who handle commodities other than wood.

Class II. *Pack or basket peddlers.* This class shall include peddlers selling and delivering only from packs, baskets, or similar containers.

Class III. *Wagon or cart peddlers selling wood only.* This class shall include peddlers who sell wood only from wagons, pushcarts, handcarts, or other vehicles.

**160–3.** It shall be unlawful for any person to engage in the business of a peddler without a license so to do; provided, however,

*License required*

**508**

that the classes of peddlers specifically defined and licensed by other chapters of this code shall be exempt from the provisions of this chapter.

Any person violating this section shall be fined not less than one dollar nor more than fifty dollars for each offense.

160–4. Every individual who desires a license as a peddler shall make application therefor in conformity with the general requirements of this code relating to applications for licenses, and shall state whether the applicant desires to be licensed as a class I, class II, or class III peddler. Such application shall also state in what commodity or article of merchandise such peddler desires or intends to deal.

*Application*

160–5. Each applicant for a class I peddler's license who desires to engage in the business of peddling oil, solely, shall so state in his application, and shall specify the number of vehicles he desires or intends to employ in and about such business, and such application shall be accompanied by a certificate from the commissioner of public works certifying that each vehicle to be used by such oil peddler in and about his business is equipped and provided with drip-pans or other devices which will effectually prevent the spilling or dripping upon the pavement or street of any of the oil or products thereof to be conveyed in such vehicle, and that such drip-pans or other devices are of a type approved by the said commissioner.

*Oil peddlers*

The issuance of a license authorizing an individual to engage in the business of peddling oil shall not be construed as authorizing such individual to conduct or operate a filling station or engage in the business of fuel oil dealer without obtaining licenses therefor.

Vehicles used for conveying oil and other flammable liquids shall not be used for the conveying of ice or any article of food or food products.

160–6. The annual fee for a class I peddler's license shall be fifty dollars for each vehicle.

*License fee*

The annual fee for a class II peddler's license shall be thirty dollars.

The annual fee for a class III peddler's license shall be twenty-four dollars for each vehicle. [Amend. Coun.J. 11–6–47, p. 1172; 12–12–75, p. 1730.]

160–7. Peddlers' licenses under class I and class II as defined in this chapter shall be issued for semi-annual periods beginning respectively on the first days of January and July of each year, and no such licenses shall be issued except for to peddle oil and other flammable liquids from a vehicle under class I shall be issued for an annual period beginning on the first day of January of each year.

*License periods*

Peddlers' licenses under class III as defined in this chapter shall be issued for an annual period beginning on the first day of January of each year.

No license shall be issued under this chapter except for the full license period and the full license fee.

160–8. Every wagon, cart, or other vehicle used by a licensed peddler in or about his business shall have the name of the owner and his address plainly, distinctly, and legibly painted in letters and figures at least two inches in height in a conspicuous place on the outside of each side of every such wagon, cart, or other vehicle, and such name and address shall be kept so painted plainly and distinctly at all times

*Identification on peddlers' vehicles*

■■■■■■■■

while such wagon, cart, or other vehicle is in use during the continuance of the license covering the use of such wagon, cart, or other vehicle.

**160–9.** Every peddler whose license entitles him to use a wagon, motor vehicle, handcart, pushcart, or other vehicle shall obtain from the city clerk, at the time his license is issued, a metal plate or other suitable emblem for each such vehicle to be used by him in or about his business. Such plate or emblem shall have stamped or imprinted thereon the words "Chicago Wagon or Cart Peddler", "Chicago Oil Peddler", "Chicago Pack or Basket Peddler", or "Chicago Wood Peddler", as the case may be. Such plate or emblem shall be of a different color and design for every license period and shall have stamped thereon a number corresponding to the number of such peddler's license. *Emblems on vehicles*

**160–10.** Every individual having a license as a peddler, while engaged in the business of peddling, shall wear conspicuously on the outside of his outside coat a metal badge or shield. If such peddler be licensed to peddle from a wagon, pushcart, or other like vehicle, the badge to be worn by him shall have stamped thereon the words "Wagon or Cart Peddler". If such peddler be licensed as a pack or basket peddler, such badge shall have stamped thereon the words "Pack or Basket Peddler". If such peddler be licensed as an oil peddler or as a wood peddler, solely, such badge shall have stamped thereon the words "Oil Peddler" or "Wood Peddler", as the case may be. *Badges*

**160–11.** Upon each wagon or other vehicle drawn or propelled by animal or mechanical power, licensed under the provisions of this chapter, there shall be permitted but one helper or assistant to the driver or operator of such wagon or vehicle. *Assistants on vehicles*

**160–12.** No one shall peddle any article or thing anywhere in the city on Sunday, or in any public alley on any day in the week between the hours of 5:00 p. m. and 7:00 a. m., under a penalty of not less than five dollars nor more than fifty dollars for each offense. [Amend. Coun.J. 5–14–53, p. 4773.] *Peddling on Sundays or in alleys*

**160–13.** No one having a peddler's license shall peddle any merchandise or any other article or thing whatsoever, at any time, within districts which have been or shall be hereafter so designated by the city counsel. [Amend. Coun.J. 12–21–39, p. 1396.] *Peddling prohibited in certain districts*

**160–13.1.** No person licensed hereunder shall have the privilege of peddling flowers, growing plants, or floral bouquets or designs. [Added. Coun.J. 12–15–43, p. 978.] *Peddling flowers prohibited*

**160–13.2.** The fourth Friday of September of each year shall be designated as "National Kids' Day". The city clerk, the commissioner of public works, the commissioner of streets and sanitation, the Superintendent of Police, and the president of the board of health are directed to issue all necessary permits, without any charge therefor, to the Kiwanis International, its officers, members and agents to sell at retail peanuts upon the public ways of the city of Chicago on National Kids' Day, any other provisions of this code to the contrary notwithstanding. The proceeds from the sale of peanuts by the Kiwanis International, its officers, members and agents on National Kids' Day shall be used exclusively for charitable purposes for underprivileged children in the city of Chicago. [Added. Coun.J. 5–21–52, p. 2480; amend. 4–22–53, p. 4700.] *National Kids' Day sales*

**160–14.** Any peddler who shall be guilty of any fraud, cheat, misrepresentation, or imposition, or who shall violate any of the provisions of this chapter, shall be fined not less than five dollars nor more than *Penalty*

two hundred dollars for each offense, where no other penalty is provided in this chapter.

**193–1.** A person commits disorderly conduct when he knowingly:    Disorderly conduct

(a) Does any act in such unreasonable manner as to provoke, make or aid in making a breach of peace; or

(b) Does or makes any unreasonable or offensive act, utterance, gesture or display which, under the circumstances, creates a clear and present danger of a breach of peace or imminent threat of violence; or

(c) Refuses or fails to cease and desist any peaceful conduct or activity likely to produce a breach of peace where there is an imminent threat of violence, and where the police have made all reasonable efforts to protect the otherwise peaceful conduct and activity, and have requested that said conduct and activity be stopped and explained the request if there be time; or

(d) Fails to obey a lawful order of dispersal by a person known by him to be a peace officer under circumstances where three or more persons are committing acts of disorderly conduct in the immediate vicinity, which acts are likely to cause substantial harm or serious inconvenience, annoyance or alarm; or

(e) Assembles with three or more persons for the purpose of using force or violence to disturb the public peace; or

(f) Goes about begging or soliciting funds on the public ways, except as provided in Chapter 36, Sections 11 through 18; or

(g) Appears in any public place manifestly under the influence of alcohol, narcotics or other drug, not therapeutically administered, to the degree that he may endanger himself or other persons or property, or annoy persons in his vicinity; or

(h) Carries in a threatening or menacing manner, without authority of law, any pistol, revolver, dagger, razor, dangerous knife, stiletto, knuckles, slingshot, an object containing noxious or deleterious liquid, gas or substance or other dangerous weapon, or conceals said weapon on or about the person or vehicle; or

(i) Pickets or demonstrates on a public way within 150 feet of any primary or secondary school building while the school is in session and one-half hour before the school is in session and one-half hour after the school session has been concluded, provided that this subsection does not prohibit the peaceful picketing of any school involved in a labor dispute; or

(j) Pickets or demonstrates on a public way within 150 feet of any church, temple, synagogue or other place of worship while services are being conducted and one-half hour before services are to be conducted and one-half hour after services have been concluded, provided that this subsection does not prohibit the peaceful picketing of any church, temple, synagogue or other place of worship involved in a labor dispute.

A person convicted of disorderly conduct shall be fined not less than $5.00 nor more than $500.00 for each offense. [Amend. Coun.J. 5–24–51, p. 312. New section passed Coun.J. 3–26–68, p. 2561.]